Cite as 2021 Ark. App. 430
# ARKANSAS COURT OF APPEALS
DIVISION IV
No. CV-20-676

|  |  |  |
|---|---|---|
| | | **Opinion Delivered** November 3, 2021 |
| KEVIN JOLLIFF | APPELLANT | APPEAL FROM THE MISSISSIPPI COUNTY CIRCUIT COURT, CHICKASAWBA DISTRICT [NO. 47BDR-18-145 ] |
| V. | | |
| JESSICA WILSON | APPELLEE | HONORABLE BRENT DAVIS, JUDGE |
| | | AFFIRMED |

## WAYMOND M. BROWN, Judge

Appellant Kevin Jolliff appeals from the six-month order of protection entered against him on August 13, 2020, in Mississippi County. The order of protection prevents appellant from contacting appellee, Jessica Wilson, and the parties' daughter, KS, for the duration of the protection order. Appellant argues on appeal that the order of protection should be reversed and remanded because (1) the circuit court abused its discretion in disallowing exhibits and testimony without an inquiry into the competency of the child witness; (2) the recording was admissible under the Arkansas Rules of Evidence; and (3) the circuit court erred in concluding he was guilty of domestic abuse, because it was based on speculation and conjecture. We affirm.

Appellee petitioned the circuit court for an order of protection for herself and KS on December 5, 2019.[1]  In the petition, appellee stated she was seeking the protection order following events that took place on November 28—Thanksgiving evening.  Appellee alleged that when she returned KS to appellant's house on Thanksgiving, she followed KS inside for a hug and kiss.  However, she stated that afterwards, KS attempted to run up to appellee and hug her again and that appellant put his arm out and shoved KS into the floor onto her bottom.  KS began screaming for appellee not to leave her, and appellant picked KS up and took her into the bedroom.  In the bedroom, appellant covered KS with blankets up to her neck and placed his leg over KS to hold her down.  Appellant yelled for KS to "shut up" and struck the wall behind KS's head several times.  He also told KS that she is just as "retarded as [her] mother is."  When appellee walked to the kitchen to tell appellant not to speak to KS like that, appellant grabbed appellee by her shoulders and shoved her out the front door, causing appellee to fall to her knees on the deck.  As a result, appellee had bruises on her shoulders and knees.  Appellee left appellant's residence and subsequently attempted suicide by taking Benadryl.  Appellee was taken to St. Bernards Medical Center and then transferred to St. Bernards Behavioral Health.  In the accompanying affidavit,

---

[1]The evidence in the record shows that this was the third order of protection appellee sought against appellant.  The first order of protection was sought in April 2018 after appellant blacked appellee's eye with KS's fishing pole.  A temporary order of protection was entered; however, it was dismissed on May 4 at appellee's request.  Appellee sought a second order of protection in July 2019 after appellant grabbed her by the neck and threw her to the ground and climbed on top of her with his knees on her collarbone.  Both appellee and appellant were arrested in June at the time of the incident.  Although appellee was able to obtain a temporary order of protection against appellant, the case was dismissed in August because there was a no-contact order in place in the pending criminal case.

appellee stated that she and KS had suffered years of mental, physical, and emotional abuse at the hands of appellant. She alleged that appellant is unpredictable and very violent. She stated that she had had her lip busted, her eye blacked, and bruises left on her arms and shoulders because of appellant's abuse. She stated that KS has had bruises on her legs, back, and arms. She said that appellant has denied KS food when she did not listen to appellant. Appellee also stated that appellant is verbally abusive to her and KS. The circuit court entered a temporary order of protection the same day.

A hearing was held to address appellee's order of protection on December 20. Appellee testified that she is twenty-nine years old and currently lives in Manila, Arkansas, with her parents. She stated that she has lived with her parents since June, and prior to that, she lived with appellant for approximately three years. Appellee testified that she and appellant have one child together, KS. She said that although the hearing was to address her most recent allegations of abuse, she had suffered systemic abuse for the duration of the parties' relationship. She testified in pertinent part about the events that took place on Thanksgiving night when she returned KS to appellant's home:

> We were sharing her for Thanksgiving. We do not normally meet at his house for that. We usually meet at a gas station. We met at his house on this particular occasion. I was bringing my daughter back to him at his house. I was by myself. When I got to the door of his house, my daughter walked in and I walked in behind her to tell her goodbye. She walked into the middle of the living room floor. She began to cry when I was leaving and like, she wanted to give me a hug and Kevin stiff-armed her into the floor and stopped her from giving me a hug. He physically knocked her down, onto her bottom. Then she got up and was crying really, really hard and was screaming for me still. He grabbed her up and took her back to the bedroom and covered her up with blankets. When he picked her up and carried her off, I was standing in the doorway of the house.

> When I could hear my daughter screaming, I walked to the kitchen. I could see into the bedroom from the kitchen.

I first heard her screaming, I could also hear him screaming. He was hitting a wall. I then proceeded into the house. At that point, I could see what was happening, and he was leaning over her, his right leg was over her body and he was hitting the wall and telling her to shut up, very loud, like hard enough to where, he was hitting the wall hard to where the stuff in the living room was moving. I told him to stop. I said please stop and then he come after me. He grabbed me by my shoulders forcibly enough to leave bruises and pushed me out the door. I had marks on my knees and across my forehead where he pushed me out the door and I hit the deck on his house. When I was pushed out the door I landed on my knees and my head hit the railing on the deck of the house. I left at that point.

Appellee introduced photos of the injuries she sustained that night. She stated that she left KS with appellant because it was his time to have KS. She said that she was very upset when she arrived home, so she took a lot of Benadryl. She stated that her dad took her to the emergency room the next day and that she went to St. Bernards. She testified that she is still attending therapy at St. Bernards for depression, anxiety, and bipolar disorder resulting from the way she was treated by appellant. She stated that there were several domestic-abuse incidents with appellant between her first and second petitions for orders of protection. She said that when appellant was not physically violent toward her, he was mentally violent. She also said that he would tell KS to shut up and go do certain things and that he was physically abusive to KS. She testified about an incident in which appellant turned out the bathroom light when KS tried to use the bathroom in the middle of the night, resulting in KS getting in bed without using the bathroom. KS subsequently wet the bed. She stated that appellant had whipped KS for getting toothpaste on the bathroom-sink counter. Appellee also testified that appellant yells and screams at KS. Appellee said that she has called her mom several times to come pick KS up because she did not want KS to witness appellant's violence. She stated that KS is now in counseling. Appellee testified that when she and appellant first split, KS would become physically ill when it was time for

4

her to go see appellant. Appellee stated that she and appellant had attended counseling together a week before the Thanksgiving incident. She testified that she believes appellant is a danger to KS because KS is "mouthy and talks back," which appellant does not like. She also said that KS throws fits when she does not get her way and that appellant "will do anything necessary to make her be quiet. He screams and yells at her on a regular basis. He is physically violent with her for things like that." She said that is why she is seeking an order of protection for KS and herself.

On cross-examination, appellee admitted that she regularly checked that there was no custody order, on her petitions for orders of protection although there was a November 2017 order establishing custody and granting true joint custody. She denied going to Great River Medical Center in Blytheville at the end of May or June 2019 due to an overdose but said that she was seen there for a stomach virus. Appellee said that she had attempted an overdose in February 2019 and was seen at St. Bernards. Appellee agreed that there seems to be a pattern with her filing a petition for an order of protection, which subsequently gets dismissed on the no-contact order. Appellee stated that when the officers arrived following the June incident, she and appellant were arrested even though she denied hitting appellant and she had visible scratches and bruises on her. Appellee denied that she would file for orders of protection because appellant had put her out of the home due to her drug abuse. She also denied having a history of either drug or alcohol abuse. Text messages between appellee and her mother were introduced showing that appellee had asked her mother for "money for smoke" and for pills. Appellee admitted that some time prior to the April 2018 petition, appellant had kicked her out because he did not want her doing drugs

in the house although they were her prescription medications. Appellee denied that she sought orders of protection so that her parents can get guardianship over KS without appellant's consent.

On redirect, appellee testified that in the past, she has gone back to appellant after he had been abusive. She also said that her parents have filed for guardianship over KS. She stated that a few months before the hearing, appellant backhanded KS in the mouth because she "said something kind of four-year-oldish." Appellee said that since that time, KS has complained about her front tooth hurting and has been talking with a lisp.

On recross, appellee stated that there were mutual no-contact orders entered against both her and appellant following the June incident, with the only exception being the custody exchanges. She said that they had agreed that the exchanges would take place at the gas station, but she went to his house on Thanksgiving instead of the gas station.

Jeff Wilson, appellee's father, testified that appellee currently lives with him and his wife. He stated that there have been other times appellee had moved in with them due to arguments and fights and appellant hitting her. He said that there were also times, usually every couple of months, that appellee would call and ask his wife to come get KS. He admitted that at one point in 2018, he did file for guardianship over KS because appellant was hitting appellee in front of KS. He stated that he has personally overheard appellant yelling and screaming at either appellee or KS while on the phone with appellee. He said that the guardianship petition was filed when appellee left appellant and moved in with them.

On cross-examination, Jeff stated that appellee was not living with him over the Thanksgiving holiday, but she lives with him now. He said that he has taken appellee to a behavioral health hospital for a drug overdose only once. He denied ever seeing appellee do drugs in his presence. Jeff stated that neither he nor his wife provide appellee with pills but that appellee takes a prescription.

Appellant testified that appellee came to his home on Thanksgiving evening to bring KS back. He stated that he could hear appellee and her parents fighting in the car. He said that KS got out of the car and ran to him and that appellee began yelling and cussing. He testified that appellee asked if she could stay, and he said no. He stated that when KS told appellee to go, appellee started hollering and cussing and threw a pill bottle at him. He said that he recognized appellee's parents' car and could hear her father's voice. He stated that he believes appellee made the custody exchange at his home instead of the gas station so that she could set him up for the affidavit. He said that the pill bottle appellee threw at him belonged to appellee and had a refill date of November 27. The pill bottle was introduced. Appellant testified that he made a recording of KS that evening pertaining to the events that happened.

Appellee's counsel objected to the recording being played. Appellant's counsel responded that playing the recording was better than putting four-year-old KS on the stand and called out "8-03-1, 8-03-2, 8-03-5, and 8-03-24." The attorney also stated that the recording "reflects that the child says that the fight occurred between Ms. Wilson and her mother." The attorney then told the court that it could decide from hearing the recording if it needed to come in or not. He also stated that he had four different exclusions as to

7

how they apply. The court sustained the objection once it verified that the recording

contained statements from KS claiming that appellee's mother was the source of the bruises

or injuries to appellee. The following colloquy then took place.

MR. CHEADLE: It is a recorded recollection of right then, excited utterance of the child. Under 24 is the other substantial reasons. It is the actual recording.

THE COURT: 24, which is the catchall?

MR. CHEADLE: It is the catchall and it is the actual recording. So, it is not him saying that the kid said it. Both parents can authenticate that as the child's voice, and it is vastly better than putting a four-year-old on the stand.

MR. THOMAS: We don't 'know [sic] if she's coached to say it. That is why I think she needs to be on the stand.

THE COURT: As far as most four-year-olds are not going to qualify as witnesses anyway. The Court would be extremely interested in being able to ascertain whether a four-year-old could understand the importance of being truthful and honest and the requirements of an oath. In my experience, it is rare, if ever, that you find a four-year-old that can meet those requirements. So, to allow the statement of that same four-year-old under circumstances that it was recorded by one parent to be introduced for the truth of the matter asserted, I am going to sustain the objection. [It] deprives the other side the opportunity to cross-examine that witness.

MR. CHEADLE: If they want to call the child, I would not object.

THE COURT: I am sustaining the objection, and with that you have exceeded your time.

Appellee was recalled for rebuttal. She testified that she was at appellant's house for

the exchange because they had agreed that it would take place there. She stated that no one

was with her and KS when she arrived at appellant's house. She denied throwing a pill

bottle at appellant or asking to stay. She testified that her parents were not at appellant's

8

house with her. She stated that appellant must have gotten the empty pill bottle in his possession because it was left there. She stated that she did not know how many pills were in the bottle.

The circuit court found that appellee's testimony was credible and established that she and KS has been subjected to domestic abuse by appellant. Since there was no request that the order be entered for any length of time, the circuit court entered the order of protection for six months. The circuit court left it up to appellee to decide if visitation should occur during this time between appellant and KS but found that there should be no overnight visitations and that the visits had to be monitored by a responsible adult. The final order of protection was entered on August 13, 2020. This timely appeal followed.

Our standard of review following a bench trial is whether the circuit court's findings are clearly erroneous or clearly against the preponderance of the evidence.[2] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made.[3] Disputed facts and credibility determinations are both within the province of the fact–finder.[4]

We address appellant's third point on appeal first as it seems to be a challenge to the sufficiency of the evidence. Appellant argues that the circuit court erred in concluding he was guilty of domestic abuse because its conclusion was based on speculation and conjecture.

---

[2]*Baltz v. Baltz*, 2021 Ark. App. 202, 624 S.W.3d 338.

[3]*Id.*

[4]*Id.*

9

The circuit court found that appellee had proved domestic abuse by appellant by a preponderance of the evidence. Domestic abuse is defined as [p]hysical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury, or assault between family or household members.[5] Appellant maintains that the circuit court resorted to speculation and conjecture to make its finding because neither the police officers who responded nor medical personnel were called as witnesses; appellee objected to the only independent witness, KS; and appellee's testimony was not credible due to her drug–seeking behavior and her prior conduct of filing and then dismissing petitions for orders of protection.

Appellee's testimony was enough to establish that she and KS suffered domestic abuse at appellant's hands. She testified about appellant's actions on Thanksgiving 2019, which the circuit court found credible. On that night, appellant shoved KS to the floor and subsequently took her to the back bedroom where he covered her in blankets to her neck and placed his leg on top of her to hold her down. During this time, he was yelling at her to shut up and beating the wall above her head. When appellee attempted to say something, appellant grabbed her by her shoulders and pushed her out of the house. She fell to her knees on the deck and suffered bruises in several areas of her body. Pictures of appellee's injuries were admitted without objection. Therefore, the evidence was sufficient to support the circuit court's finding. To the extent that appellant asks us to reweigh the evidence in

---

[5]Ark. Code Ann. § 9–15–103 (4)(A) (Repl. 2020).

10

his favor, we do not act as a super fact-finder or second-guess the circuit court's credibility finding.[6]

In his first two points, appellant challenges evidentiary rulings made by the circuit court. A circuit court's decision to admit or exclude evidence will not be reversed absent a manifest abuse of discretion.[7] The abuse-of-discretion standard is a high threshold that does not simply require error in the circuit court's decision but requires that the circuit court act improvidently, thoughtlessly, or without due consideration.[8] Further, this court will not reverse a circuit court's decision absent a showing of prejudice.[9]

Appellant argues that the circuit court abused its discretion in disallowing exhibits and testimony without an inquiry into the competency of the child witness. This argument is without merit. At no point did appellant ever attempt to call KS as a witness or otherwise attempt to have the circuit court determine her competency. During the hearing, appellant's attorney stated that he would not object if appellee called KS as a witness, which did not happen. The circuit court made a statement regarding the competency of such young witnesses while addressing appellee's hearsay objection; however, the statement was

---

[6]*Lewis v. Lewis*, 2018 Ark. App. 148.

[7]*Szwedo v. Cyrus*, 2020 Ark. App. 319, 602 S.W.3d 759.

[8]*Id.*

[9]*Id.*

not in response to a competency request made by appellant. Appellant cannot argue for the first time on appeal that the circuit court failed to do something it was never asked to do.[10]

Appellant also argues that the recording was admissible under the Arkansas Rules of Evidence. Appellant argues that the circuit court was given four exceptions to hearsay but admits that the court never made a ruling regarding any of the exceptions. It is well settled that a party's failure to obtain a ruling procedurally bars consideration of the issue on appeal.[11] Additionally, appellant failed to proffer the recording for appellate purposes, which is fatal to his appeal. The failure to proffer evidence so that the appellate court can determine whether prejudice resulted from its exclusion precludes review of the evidence on appeal.[12] As a result, appellant cannot demonstrate prejudice from the circuit court's exclusion of KS's recorded statement.

Affirmed.

WHITEAKER and HIXSON, JJ., agree.

*Robert S. Tschiemer*, for appellant.

*Gibson & Thomas, P.A.*, by: *Jeremy M. Thomas*, for appellee.

---

[10] *See Watkins v. Adams*, 2021 Ark. App. 261 (we will not consider arguments made for the first time on appeal).

[11] *See Hurst v. Dixon*, 357 Ark. 439, 182 S.W.3d 102 (2004).

[12] *Parkerson v. Brown*, 2013 Ark. App. 718, 430 S.W.3d 864.